917 F.2d 705
 59 USLW 2261
 VICTORIA SALES CORPORATION and Fritz Air Freight, Inc.,
Plaintiffs-Appellants, Cross-Appellees,
v.
EMERY AIR FREIGHT, INC., a/k/a Emery Worldwide and Lassen
GmbH, Defendants-Appellees,
Appeal of EMERY AIR FREIGHT, INC., a/k/a Emery Worldwide,
Defendant-Appellee, Cross-Appellant.
 Nos. 1257, 1418, Dockets 90-7041, 90-7131.
 United States Court of Appeals,
Second Circuit.
 Argued May 24, 1990.
Decided Oct. 22, 1990.
 
 David L. Mazaroli, New York City (Yorkston W. Grist, P.C., New York City, of counsel), for plaintiffs-appellants, cross-appellees.
 Francis A. Montbach, New York City (Bigham Englar Jones & Houston, New York City, of counsel), for defendant-appellee Emery Air Freight.
 Edward J. Henderson, New York City (Walter, Conston, Alexander & Green, New York City, of counsel), for defendant-appellee Lassen GmbH.
 Before VAN GRAAFEILAND, MESKILL and WALKER, Circuit Judges.
 MESKILL, Circuit Judge:
 
 
 1
 Plaintiffs-appellants Victoria Sales Corporation (Victoria) and Fritz Air Freight, Inc. (Fritz) appeal from a judgment of the United States District Court for the Southern District of New York, Wood, J., limiting their recovery of money damages for cargo lost outside of the boundaries of an airport under the liability limitations of the Warsaw Convention, 49 Stat. 3000, T.S. No. 876, reprinted at 49 U.S.C. App. Sec. 1502 note. Defendant-appellee Emery Air Freight, Inc. (Emery) cross-appeals the district court's award of indemnification including attorney's fees and costs to defendant-appellee Lassen GmbH (Lassen).
 
 BACKGROUND
 
 2
 In February 1984, Lassen agreed to ship a cargo of a pharmaceutical product known as coumadin from Frankfurt, West Germany to New York. Lassen prepared a waybill designating Frankfurt as the place of departure, New York as the destination, and Victoria as the consignee. It then arranged for Halbart Air Consolidator System (Halbart) to transport the cargo to Amsterdam. Halbart consolidated the cargo of coumadin with other cargo and transported the consolidated cargo to Schiphol Airport in Amsterdam by truck. At Schiphol Airport, the cargo was turned over to Speed, B.V. Handling Services (Speed). Speed in turn contracted with Emery to ship the consolidated cargo to New York. An Emery waybill was prepared, designating Speed as the shipper and Fritz as the consignee. Emery booked the cargo on a February 25 flight from Amsterdam to New York.
 
 
 3
 After the flight arrived at John F. Kennedy International Airport in New York on February 26, the consolidated cargo was unloaded and taken to Emery's warehouse facility located less than one-quarter mile outside of the airport. The various consignees of the consolidated cargo were notified of its arrival. On March 1, Victoria attempted to pick up the coumadin shipment, but Emery could not locate it. The parties agree that the cargo was lost at Emery's warehouse.
 
 
 4
 Victoria, as consignee of the coumadin shipment, and Fritz, as consignee of the consolidated cargo, initiated this action in the district court. Fritz subsequently transferred its interest in any recovery to Victoria. On the parties' motions for summary judgment, the district court ruled that the loss was governed by the Warsaw Convention. Although the full market value of the cargo was $281,571, the court held that the Convention limited Emery's liability to $20 per kilogram or $16,220. In addition, the court held that Lassen was entitled to indemnification from Emery for any amount of Lassen's liability to plaintiffs for the lost cargo and awarded Lassen $87,929.58 in attorney's fees and costs.
 
 DISCUSSION
 A. The Coverage of the Warsaw Convention
 
 5
 Section 1 of Article 18 of the Warsaw Convention provides that liability under the Convention extends to any damage to baggage or goods sustained during "transportation by air." This phrase is defined in section 2 of Article 18 as "the period during which the baggage or goods are in charge of the carrier, whether in an airport or on board an aircraft." However, section 3 of the same article provides, in pertinent part:
 
 
 6
 The period of the transportation by air shall not extend to any transportation by land ... performed outside an airport. If, however, such transportation takes place in the performance of a contract for transportation by air, for the purpose of loading, delivery or transshipment, any damage is presumed, subject to proof to the contrary, to have been the result of an event which took place during the transportation by air.
 
 
 7
 All the parties agree that the loss of the coumadin shipment occurred at Emery's warehouse, located near but nonetheless outside the boundaries of Kennedy Airport. It would appear, therefore, that the plain language of Article 18 would exclude the loss from the scope of the Warsaw Convention. Emery and Lassen attempt to avoid the implications of the plain language, however, by offering what Lassen describes as a "more practical, sensible" interpretation of Article 18, extending the coverage of the Warsaw Convention to include the storage of cargo at a place outside of the airport until the goods are picked up by the consignee pursuant to the carriage contract. See, e.g., Royal Ins. v. Amerford Air Cargo, 654 F.Supp. 679, 681-83 (S.D.N.Y.1987); Magnus Electronics, Inc. v. Royal Bank of Canada, 611 F.Supp. 436, 439-40 (N.D.Ill.1985). They further suggest that the language of Article 18 must be viewed in the light of modern commercial realities so that Emery's warehouse, despite its location outside of the airport's official boundaries, may be deemed to be functionally part of the airport. Although cognizant of the commercial realities that may force the location of a warehouse outside of the actual confines of an airport, we must reject the proposed interpretation of Article 18 because it has no support in the language of the Convention.
 
 
 8
 Our interpretation of Article 18 must begin "with the literal language of the provision. We would end there if that language [is] reasonably susceptible of only one interpretation." Buonocore v. Trans World Airlines, Inc., 900 F.2d 8, 9-10 (2d Cir.1990). Furthermore, when the text of a treaty is clear, a court shall not, through interpretation, alter or amend the treaty. Chan v. Korean Air Lines, Ltd., 490 U.S. 122, 109 S.Ct. 1676, 1683-84, 104 L.Ed.2d 113 (1989).
 
 
 9
 The plain language of Article 18 draws the line at the airport's border. The Convention's coverage excludes any transportation by land outside of the airport. Although Article 18 creates a presumption that any damage or loss occurring during the performance of a contract for air transportation was the result of an event during transportation by air, that is, on board an aircraft or within an airport, the presumption may be rebutted by evidence demonstrating that the loss occurred on land outside the airport.
 
 
 10
 Our interpretation of Article 18, contrary to the suggestion of the dissenting opinion, does not limit the meaning of "transportation by air" to "actual" air transportation. Rather, as the plain language of Article 18 directs, "transportation by air" would include a loss occurring while the cargo was in the air or on the ground but within the confines of the airport's boundaries. Under the dissenter's view, even if there is undisputed evidence, as here, that the loss occurred outside of the airport during transportation by land, the Convention governs as long as the land transportation was part of the carriage contract. This interpretation would effectively render nugatory Article 18's command that "[t]he period of the transportation by air shall not extend to any transportation by land ... performed outside an airport." This cannot be the result intended by the Convention's drafters.
 
 
 11
 Because the shipment of coumadin was admittedly lost at Emery's warehouse outside the airport, the presumption favoring Warsaw Convention coverage has been rebutted and the Convention does not govern. A different interpretation might be more "sensible," as appellees suggest, but to engraft such an interpretation onto the plain language of Article 18 would require an impermissible judicial amendment of the Convention. See Chan, 109 S.Ct. at 1684. The district court therefore erred in its conclusion that the Warsaw Convention governed appellants' claims and limited their recovery.[1]
 
 B. Indemnification of Lassen
 
 12
 The district court ruled that Emery, as the primary wrongdoer, must indemnify Lassen. Proceeding from the premise that the Warsaw Convention governed, the district court determined that indemnification was available under the Convention and awarded Lassen $87,929.58 in attorney's fees and costs as part of Emery's indemnity obligation. Emery does not challenge the reasonableness of the amount of fees and costs awarded.
 
 
 13
 As discussed supra, the Warsaw Convention does not govern this case. Lassen contends that the indemnification award may nonetheless be upheld under either federal or New York common law principles. It argues that because the loss of Victoria's cargo was entirely the fault of Emery, Lassen could only be held vicariously liable for the loss. Under the circumstances, Lassen maintains that Emery should indemnify Lassen for any loss it sustains, including attorney's fees and costs expended in this litigation.
 
 
 14
 Emery counters by arguing that the district court erred, in the absence of coverage by the Warsaw Convention, by not enforcing the liability limits set forth in Emery's waybill and relevant tariffs. The waybill provided for a $20 per kilogram limitation on Emery's liability for "destroyed, lost, damaged or delayed" cargo. Emery contends that it should not be liable for any amount to any party above this limitation and that therefore Lassen's indemnification award should be subject to the waybill's liability limits.
 
 
 15
 We find Emery's position unconvincing. The waybill's liability limitation refers only to Emery's liability for damaged, lost or delayed cargo. It does not address the rights and liabilities between Emery and a party in Lassen's status. Absent an explicit contractual provision to the contrary, we see no reason to extend the waybill's liability limitations to Lassen's indemnity claim and to abrogate the principle that a primary wrongdoer must indemnify a party whose liability is secondary or vicarious. See Ingersoll Milling Machine Co. v. M/V BODENA, 829 F.2d 293, 305 (2d Cir.1987) ("Indemnity rests upon the principle that the true wrongdoer should bear the ultimate burden of payment."), cert. denied sub nom. J.E. Bernard and Co. v. Ingersoll Milling Machine Co., 484 U.S. 1042, 108 S.Ct. 774, 98 L.Ed.2d 860 (1988); McDermott v. City of New York, 50 N.Y.2d 211, 216-17, 406 N.E.2d 460, 462, 428 N.Y.S.2d 643, 646 (1980).
 
 
 16
 Although the district court granted indemnification under the Warsaw Convention, we nevertheless view the award as sustainable on these common law principles of indemnification. There is no dispute that the cargo was lost at Emery's warehouse, and Emery does not contend that the loss was the result of any fault on the part of Lassen. Lassen's liability for the loss, therefore, could be based only on its contractual obligation to ship the cargo to New York. Between Emery and Lassen, the former, as the party primarily liable for the lost cargo, must bear the loss, and Lassen consequently is entitled to indemnification. Furthermore, the district court properly awarded Lassen attorney's fees and costs incurred in defending this action as part of its successful indemnity claim. See Peter Fabrics, Inc. v. S.S. HERMES, 765 F.2d 306, 315 (2d Cir.1985); Owens v. Palm Tree Nursing Home, Inc., 89 A.D.2d 619, 620-21, 452 N.Y.S.2d 670, 673 (2d Dep't 1982).
 
 CONCLUSION
 
 17
 That portion of the district court's judgment awarding Lassen indemnification and attorney's fees and costs from Emery is affirmed. That portion of the district court's judgment limiting plaintiffs-appellees' recovery to $16,620 under the Warsaw Convention is vacated. The case is remanded for further proceedings consistent with this opinion.
 
 
 18
 VAN GRAAFEILAND, Circuit Judge, concurring in part and dissenting in part:
 
 
 19
 Because I believe that Judge Wood correctly interpreted Article 18 of the Warsaw Convention (the "Convention"), I respectfully dissent from my colleagues' holding to the contrary. Our differences revolve around the term "transportation by air" as used in that Article.
 
 
 20
 Admittedly, Article 18 is not a good example of superior legislative draftsmanship. See Beaumont, Need For Revision and Amplification of the Warsaw Convention, 16 J. Air L. & Com. 395, 402-03 (1949). However, one thing is clear, and that is that the term "transportation by air" is not synonymous with "actual" air transportation.[1] See Denby v. Seaboard World Airlines, 737 F.2d 172, 182 n. 20 (2d Cir.1984); Manufacturers Hanover Trust Co. v. Alitalia Airlines, 429 F.Supp. 964 (S.D.N.Y.), aff'd mem., 573 F.2d 1292 (2d Cir.1977); Julius Young Jewelry Mfg. Co. v. Delta Air Lines, 67 A.D.2d 148, 151 (1st Dept.1979); cf. Federal Aviation Act of 1958, Pub.L. No. 85-726, Sec. 21, 72 Stat. 731, 738 (1958), codified formerly at 49 U.S.C. Sec. 1301(21), now at Sec. 1301(23); City of Philadelphia v. C.A.B., 289 F.2d 770, 773-74 (D.C.Cir.1961); Twentieth Century Delivery Serv., Inc. v. St. Paul Fire & Marine Ins. Co., 242 F.2d 292, 299 (9th Cir.1957).
 
 
 21
 "Transportation by air" is a term of art. Magnus Electronics, Inc. v. Royal Bank of Canada, 611 F.Supp. 436, 439 (N.D.Ill.1985). It is defined in Article 18(2). As my colleagues correctly note, it "comprise[s] the period during which the baggage or goods are in charge of the carrier, whether in an airport or on board an aircraft." Id. "Transportation by air" does not encompass "transportation by land, by sea, or by river performed outside an airport." Id. However, if such off-airport transportation takes place "in the performance of a contract for transportation by air, for the purpose of ... delivery ... any damage is presumed, subject to proof to the contrary, to have been the result of an event which took place during the transportation by air." Id.
 
 
 22
 It is with regard to the meaning of the phrase "transportation by air" that my colleagues and I part company. They say that it means "actual" air transportation, i.e., that the loss occurred while the goods were in the air, not on the ground. I disagree. My colleagues' position requires the phrase to have two different meanings within the same sentence. Such variance in the interpretation of the phrase violates several well-accepted principles of statutory construction. The first of these is that where a statute states what a term means, all other meanings not stated are excluded. Calautti v. Franklin, 439 U.S. 379, 392 n. 10, 99 S.Ct. 675, 684 n. 10, 58 L.Ed.2d 596 (1979); Johns-Manville Corp. v. United States, 855 F.2d 1556, 1559 (Fed.Cir.1988), cert. denied, 489 U.S. 1066, 109 S.Ct. 1342, 103 L.Ed.2d 811 (1989); 1A N. Singer, Sutherland Statutes & Statutory Construction Sec. 20.08, 1989 Supp. at 10 (4th ed. 1985). The second principle is that when a word or phrase is used more than once in the same section of an act and the meaning is clear as used in one place, it will be construed to have the same meaning in the other place or places. United States v. Ivic, 700 F.2d 51, 60 (2d Cir.1983); United States v. Nunez, 573 F.2d 769, 771 (2d Cir.), cert. denied, 436 U.S. 930, 98 S.Ct. 2828, 56 L.Ed.2d 774 (1978).
 
 
 23
 In my opinion, the presumption that the loss resulted from an event occurring during the transportation by air means only that the loss is presumed to have occurred while the goods were in the charge of a carrier that was acting "in the performance of a contract for transportation by air." The pertinent second sentence of Article 18(3) reads: "If, however, such transportation takes place in the performance of a contract for transportation by air, for the purpose of loading, delivery or transshipment, any damage is presumed, subject to proof to the contrary, to have been the result of an event which took place during the transportation by air." A careful parsing of this sentence supports the conclusion above expressed. The sentence begins by referring to [off airport] transportation that "takes place in the performance of a contract for transportation by air"; it concludes by saying that any damage is presumed to have occurred "during the transportation by air" (emphasis supplied). The principles of statutory construction discussed in the preceding paragraph are clearly applicable; the phrase "transportation by air" has the same meaning at the end of the sentence as it had at the beginning. To further emphasize the identity of meaning, the second time the phrase is used it is preceded by the function word "the", which obviously refers to the prior use of the same phrase. See Webster's Third New International Dictionary at 2368. I believe that District Judge Shadur of the Northern District of Illinois correctly interpreted Article 18(3) when he said, "So long as the goods remain in the air carrier's actual or constructive possession pursuant to the terms of the carriage contract, the period of 'transportation by air' does not end." Magnus Electronics, supra, 611 F.Supp. at 440.
 
 
 24
 Proof that the carrier has entrusted the delivery of goods to a trucker or other independent agency may be sufficient to terminate the "transportation by air." See Railroad Salvage of Conn., Inc. v. Japan Freight Consolidators (USA) Inc., 556 F.Supp. 124, 126-27 (E.D.N.Y.1983), aff'd mem., 779 F.2d 38 (2d Cir.1985). But see Jaycees Patou, Inc. v. Pier Air International, Ltd., 714 F.Supp. 81, 83-84 (S.D.N.Y.1989). However, in the absence of such proof, the presumption of Article 18(3) prevails. See Royal Insurance v. Amerford Air Cargo, 654 F.Supp. 679, 681-83 (S.D.N.Y.1987); Magnus Electronics, supra, 611 F.Supp. at 439-40; Eggink v. Trans World Airlines, 87 Civ. 3403, 1990 WL 6553 (S.D.N.Y.1990) (1990 U.S.Dist. LEXIS 588); Quantime Corp. v. W.J. Donovan, Inc., No. 86-1415-N (D.Mass.1988) (1988 U.S.Dist. LEXIS 4027); Kinney Shoe Corp. v. Alitalia Airlines, No. 79 Civ. 919-CSH (S.D.N.Y.1980), 15 Av.Cas. (CCH) p 18,509. In short, I agree with Judge Wood that the loss in the instant case occurred during "transportation by air" so as to fall within the terms of the Convention.
 
 
 25
 Up to this point I have assumed that the loss occurred "outside an airport" within the meaning of the Convention. However, this may not be a proper assumption to make. The term "airport" is not defined in the Convention. As Beaumont, supra, stated, 16 J. Air L. & Com. at 402, "It is not clear if goods in bond or customs in or near an airport are 'in an aerodrome,' or what exactly comprises an aerodrome, especially in the case of a sea or water airport." We would not be "insert[ing] an amendment", as proscribed in Chan v. Korean Air Lines, Ltd., 490 U.S. 122, 109 S.Ct. 1676, 1683-84, 104 L.Ed.2d 113 (1989), if we viewed airports as functional rather than "metes and bounds" entities. Because of the tremendous growth in air cargo transportation and the virtual impossibility of crowding all the unloading and delivery facilities of every carrier into the geographical confines of busy airports, we ought to interpret the term "airport" in a manner that will carry out the general intent of the Convention's framers. See Reed v. Wiser, 555 F.2d 1079, 1090 (2d Cir.), cert. denied, 434 U.S. 922, 98 S.Ct. 399, 54 L.Ed.2d 279 (1977); Eck v. United Arab Airlines, 360 F.2d 804, 812-15 (2d Cir.1966). If, for example, a carrier's unloading facilities were partially within and partially without an airport's geographical boundaries, it would border on the absurd to determine Convention coverage by where in the carrier's building the goods were located, particularly if they were lying athwart the airport's geographical boundary line. I suggest that if a carrier is performing the normal functions of an airport facility in its handling of cargo, the general intent of the framers would be to bring it within the "transportation by air" provisions of the Convention. "The term 'airport' is in more common use than 'aerodrome', as signifying the whole undertaking involved in the use of an organized permanent place for landing and departure of aircraft, and the embarking and disembarking of passengers, rather than the piece of land used for that purpose." 1 P. Martin, et al., Shawcross & Beaumont: Air Law III(2)1 (4th ed. 1985).
 
 
 26
 Because I differ from my colleagues concerning the applicability of the Convention, I must address an issue that they were not required to consider, viz., whether the waybill issued by Lassen failed to contain all of the particulars required by Article 8(a) through (i) and (o), so as to preclude the defendants from relying on the limitation of liability provisions of Article 9. No claim was made in plaintiff's original complaint concerning such alleged omissions. Over defendants' objection, plaintiffs were permitted to serve an amended complaint alleging in a second cause of action that the waybills "did not comply with, or contain all the particulars required by, the Warsaw Convention." The affidavit of plaintiffs' attorney in support of their motion for summary judgment and in opposition to the defendants' motion, stated that "[t]he Emery air waybills are defective under the Warsaw Convention", but the only defect it alleged was the failure of the waybill to specify the "first carrier", which was not in fact a defect at all.
 
 
 27
 In her first opinion, Judge Wood stated that the omissions challenged before her were in fact contained in Lassen's air waybill, but "even if they were not, plaintiffs have not shown that they were prejudiced in any way by these omissions. See Exim Industries, 754 F.2d at 108 (omissions were technical and did not prejudice the shipper)." My examination of the waybill satisfies me that, insofar as the transportation by air undertaken by Emery is concerned, the waybill contained all the information called for by Article 8 with the possible exception of markings, if any, on the lost package and its volume or dimensions. We thus are presented with substantially the same issue that was before us in Exim Industries, Inc. v. Pan American World Airways, 754 F.2d 106 (2d Cir.1985), and Republic National Bank v. Eastern Airlines, 815 F.2d 232 (2d Cir.1987), and must decide whether Justice Scalia's dictum references to Article 8 in Chan, supra, 109 S.Ct. at 1682-83, overturned sub silentio those decisions. I believe that they did not.
 
 
 28
 The issue before the Court in Chan was whether the carrier's failure to provide notice in 10-point type of limited personal injury recovery as required by the Montreal Agreement precluded the carrier from relying on the limitation. Writing for the Court majority, Justice Scalia held that the Warsaw Convention contained no sanction for failure to print the notice in 10-point type. 109 S.Ct. at 1680. He refused to "insert an amendment" in the Convention by adding a sanction that the Convention did not contain. Justice Scalia's reference to Article 9's specific sanction for a defective cargo waybill was only to emphasize the contrast between personal injury claims and claims for property damage.
 
 
 29
 Justice Scalia did not specify what omissions would constitute violations of Article 8. He did not attempt to reverse the traditional canon of liberal treaty construction that permits courts to go beyond the written words and look to "the history of the treaty, the negotiations, and the practical construction adopted by the parties." Air France v. Saks, 470 U.S. 392, 396, 105 S.Ct. 1338, 1341, 84 L.Ed.2d 289 (1985) (quoting Choctaw Nation of Indians v. United States, 318 U.S. 423, 431-32, 63 S.Ct. 672, 677-78, 87 L.Ed. 877 (1943)). Finally, he had no occasion to consider the Convention's intended purpose of creating an international uniform law. See Trans World Airlines v. Franklin Mint Corp., 466 U.S. 243, 247, 104 S.Ct. 1776, 1780, 80 L.Ed.2d 273 (1984); Reed, supra, 555 F.2d at 1083. In Exim Industries and Republic National Bank, supra, we considered all of these factors and we cited Corocraft Ltd. v. Pan American Airways, Inc., [1969] 1 All E.R. 82, 1 Q.B. 616, as one of the authorities that supported our holding. Some elaboration on the Corocraft holding, which is not available in many American libraries, may assist the reader in understanding the reasoning behind our opinions.
 
 
 30
 In Corocraft, the plaintiff shipped a package of jewelry from the United States to England via Pan American Airways with no value declared. The jewelry was stolen. Plaintiff contended that the waybill did not comply with Article 8(i) in that it contained the weight of the package but did not give its volume or dimensions. The court rejected this contention. Lord Denning, author of the opinion, observed that the original French text of the Convention did not contain the word "and" that appears in the English translation of both Article 8(h) and Article 8(i). 1 All E.R. at 86. Citing Block v. Compagnie Nationale Air France, 386 F.2d 323 (5th Cir.1967), cert. denied, 392 U.S. 905, 88 S.Ct. 2053, 20 L.Ed.2d 1363 (1968), as authority, Lord Denning stated that in the United States "the French text prevails." Id. at 87. He continued, "If such be the view of the American courts, we surely should take the same view." Id. He concluded, "On my interpretation of the French text, art. 8(i) is satisfied in this case." Id. at 88.
 
 
 31
 Referring to the English translation which contains the word "and", Lord Denning stated that, interpreted literally, Article 8(i) would require that the weight and quantity be given and either the volume or the dimensions. He held, however, that only those particulars that are applicable under the circumstances should be given. "The important particular in most cases," he said, "is the 'weight': and so long as that is given, no more particulars under art. 8(i) are necessary or useful." Id.
 
 
 32
 In support of that holding, Lord Denning cited the New York case of American Smelting & Refining Co. v. Philippine Air Lines, [1954] U.S. & Can. Av. Rep. 221, aff'd mem., 285 A.D. 1119, 141 N.Y.S.2d 818 (1955), aff'd mem., 1 N.Y.2d 866, 153 N.Y.S.2d 900, 136 N.E.2d 14 (1956). In that case the plaintiff shipped a cargo of gold from the United States to Hong Kong. En route, the plane made refueling and servicing stops at Honolulu, Kwajalein and Guam. It crashed while attempting to land at Hong Kong, and the gold was lost. Plaintiff contended that, because the waybill failed to list the three stops as required by Article 8(c), the defendant was not entitled to limit its liability under the Convention. The special referee, before whom the case was tried, stated that the purpose of Article 8(c) was to put the consignee on notice of the international character of the flight and the applicability of the Convention, when the places of departure and destination do not themselves indicate such facts. He concluded that this purpose was not thwarted or otherwise affected by the omission of the information required by Article 8(c).
 
 
 33
 Lord Denning said that he was in "entire agreement" with the New York courts, but that even if he disagreed, he would follow them in a matter which was of international concern. 1 All E.R. at 88. In summation, Lord Denning concluded:
 
 
 34
 In my opinion, whether we look to the French text or the English text, we reach the same result. Article 8(i) requires the "weight" to be stated in all cases where that is necessary or useful. That is so in ninety-five per cent. of consignments. Article 8(i) does not require the "quantity" to be stated where that is not applicable. Nor does it require the "volume" or "dimensions" to be stated except when one or other may be necessary or useful.
 
 
 35
 Id. at 89.
 
 
 36
 In concurring, Widgery L.J. stated that the omission of any of the particulars "shall not affect the rights of the parties under the contract if the particular omitted was not necessary or useful to determine the amount of the freight, or to determine any other condition on which the parties were prepared to enter into the contract." Id. at 90.
 
 
 37
 The wisdom of the Corocraft court in rejecting the "tyranny of literalness", see United States v. Witkovich, 353 U.S. 194, 199, 77 S.Ct. 779, 782, 1 L.Ed.2d 765 (1957), is even more apparent under modern conditions of air transportation than it was when Corocraft was decided. Heavy cargo air transport and containerization, which was in the developmental stage during the 1960's, since has come into full flower. See Denby, supra, 737 F.2d at 179 and n. 10. Thus, Victoria Sales' package of coumadin was placed on a pallet with twelve other packages, and this pallet was consolidated with seventeen other pallets for shipment from Amsterdam to New York. The total consolidated shipment weighed over 45 tons and contained hundreds of items, including such things as organ pipes, flower seeds, saw blades, medical instruments, machinery parts, electrical appliances, conveyor belting, typewriter parts, and a divers helmet. The framers of the Convention hardly could have envisioned such a transport. Had they done so, they surely would have recognized the impracticability of listing all of the particulars specified in subdivisions (h) and (i) of Article 8.
 
 
 38
 As we pointed out in Exim Industries, supra, 754 F.2d at 108, both the Dutch and the Swiss courts agree with the Corocraft holding. If the Convention's expressed purpose of establishing internationally uniform regulation is to be accomplished, we should not chart a course that differs from the carefully considered and sensible holdings of competent courts in other Convention jurisdictions. Denby, supra, 737 F.2d at 176 n. 5. In short, I believe that despite Justice Scalia's statements of dictum in Chan, supra, 109 S.Ct. 1676, our decisions in Exim Industries and Republic National Bank continue to state the law of this circuit. Viewed in the light of our opinions in those cases, the waybill in the instant case is sufficiently comprehensive to entitle the defendants to limit their liability.
 
 
 39
 I agree with my colleagues that the portion of the district court's judgment awarding Lassen indemnification should be affirmed. In conclusion, then, I would affirm the district court's judgment in its entirety.
 
 
 
 [1]
 Emery argues that even if the Warsaw Convention's liability limitations do not apply to Victoria's claim, federal common law standards, rather than New York law, should govern this case. We leave it to the district court to resolve this issue in the first instance on remand. Similarly, we do not reach Victoria's contention that it is entitled to prejudgment interest. Victoria may present this claim to the district court on remand
 
 
 [1]
 On the assumption that when my colleagues used the phrase "actual air transportation" (supra, p. 707) they intended the word "actual" to have its normal meaning of "real" or "genuine", I spent several paragraphs of my dissent as originally written in challenging the use of that word. Because the legal concepts upon which I relied in making this challenge apply with equal force to the majority opinion as clarified, I have deleted only a portion of my original dissent. My conviction that Judge Wood correctly interpreted Article 18 of the Convention remains as firm as it was before this change